IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF BRECKLIN V.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF BRECKLIN V., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JOSEPH V., APPELLANT.

Filed December 21, 2021.    No. A-21-480.

Appeal from the Separate Juvenile Court of Douglas County: CHAD M. BROWN, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Leigh A. Ellis for appellant.

Nathan Barnhill, Deputy Douglas County Attorney, and Traemon Anderson, Senior Certified Law Student, for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Joseph V. appeals from the order of the Douglas County Separate Juvenile Court terminating his parental rights. He contends that the juvenile court erred in finding statutory grounds existed and that termination of his parental rights was in the minor child's best interests. For the reasons stated herein, we affirm the juvenile court's order terminating Joseph's parental rights.

- 1 -

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Joseph V. and Nicole A. are the biological parents of Brecklin V., born in June 2019. Nicole's parental rights as to Brecklin were separately terminated by the Douglas County Separate Juvenile Court and she is not part of this appeal. Nicole will only be mentioned as is relevant to Joseph's appeal.

At the time of Brecklin's birth, Nicole had already been involved with the Department of Health and Human Services (DHHS) due to the neglect of her other children. The State filed an amended petition to add allegations of neglect related to Brecklin as Nicole continued to use substances while pregnant and failed to provide proper parental care to Brecklin. Brecklin was born premature and remained in the hospital's neonatal intensive care unit for 30 days. Upon Brecklin's release from the hospital on July 8, 2019, he was placed with Joseph. Three days later, on July 11, Brecklin was removed from Joseph's care because the placement violated Joseph's parole. In connection therewith, the State filed an ex parte motion for immediate temporary custody of Brecklin together with a supplemental petition alleging Brecklin came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), because Joseph had been convicted of first degree sexual assault of a minor, was a registered sex offender, had failed to provide verification of participation in rehabilitative services, and posed a risk of harm to Brecklin. Affidavits attached to the motion indicated that Joseph was on parole after being convicted of sexual assault of a minor and was required to register as a sex offender, that Joseph had four other children who were not in his care, and that Joseph failed to provide verification that he was compliant with the terms of his parole and sex offender registration. After Brecklin was removed from Joseph's care, Brecklin was placed in foster care. Brecklin has remained in out-of-home placement throughout the pendency of this case.

On November 7, 2019, the State filed a second supplemental adjudication petition alleging that Brecklin was a child within the meaning of § 43-247(3)(a) by reason of Joseph's fault or habits. Specifically, the adjudication petition alleged that Joseph had been convicted of first degree sexual assault of a minor and was required to register as a sex offender; was unable to take placement of Brecklin; had been charged with terroristic threats; had engaged in domestic violence with Nicole; had failed to place himself in a position to parent Brecklin; had failed to provide proper parental care, support and/or supervision for Brecklin; had failed to provide safe, stable and/or appropriate housing for Brecklin; and that, for those reasons, Brecklin was at risk for harm.

The following day, November 8, 2019, Joseph was arrested for an alleged assault of Nicole in violation of the terms of his parole. As a result of the alleged assault, Joseph was charged with terroristic threats. After Joseph allegedly attempted to prevent Nicole from testifying against him in the terroristic threats case, he was also charged with, and convicted of, multiple counts of tampering with a witness. Since his arrest, Joseph has remained incarcerated during the pendency of the case with a tentative release date in 2024.

On April 3, 2020, the juvenile court adjudicated Brecklin as a child within the meaning of § 43-247(3)(a) based upon Joseph's admissions that he had been convicted of first degree sexual assault of a minor and was required to register as a sex offender; that he was unable to take placement of Brecklin; that he failed to provide proper parental care, support, and/or supervision

for Brecklin; and that for those reasons, Brecklin was at risk for harm. The court held a partial disposition hearing on that same date and ordered Joseph to participate in supervised visitation, complete a psychiatric evaluation, participate in individual therapy, and have no contact with Nicole. The court set the matter for a continued dispositional hearing in June 2020.

Following the continued dispositional hearing, the juvenile court continued prior court orders which granted Joseph reasonable rights of supervised video visitation, ordered him to participate in individual therapy, ordered him to complete a psychiatric evaluation, and ordered that Joseph have no contact with Nicole. The court also ordered Joseph to enroll in an accredited domestic violence program, participate in relinquishment counseling, and, upon release from incarceration, maintain safe and stable housing and a stable and legal source of income.

### 2. TERMINATION

In October 2020, the State filed a motion to terminate Joseph's parental rights based upon the following conditions: that Joseph had substantially and continuously or repeatedly neglected Brecklin under Neb. Rev. Stat. § 43-292(2) (Reissue 2016); that reasonable efforts to preserve and reunify the family if required had failed to correct conditions leading to adjudication under § 43-292(6); that Brecklin had been in out-of-home placement for 15 or more months of the most recent 22 months under § 43-292(7); that Joseph had subjected Brecklin to aggravated circumstances pursuant to § 43-292(9); and that termination of Joseph's parental rights was in Brecklin's best interests. Regarding § 43-292(6), the State specifically alleged that Joseph failed to comply with court orders requiring him not to have contact with Nicole, failed to complete a psychiatric evaluation, and failed to participate in individual therapy.

The termination hearing was held over 2 days in March and April 2021. The State called witnesses including Kelli Garner, caseworker from January to August 2020; Kaitlyn Smith, caseworker from August 2020 to February 2021; Brecklin's foster parent; Laurel Hall, family advocate coordinator; and Tara Bos, Nicole's probation officer. Joseph testified in his own behalf and also called Jeffrey Beran, a Nebraska parole officer, as a witness. The testimony and evidence presented during the termination hearing generally centered on four main categories: (a) communication between Joseph and the caseworkers, (b) Joseph's compliance with court orders, (c) issues with visitation, and (d) circumstances governing Brecklin's best interests.

### (a) Communication

At the termination hearing, the caseworkers both indicated that termination was in Brecklin's best interests due to the fact that Joseph was unable to parent or care for Brecklin's needs virtually, that Joseph failed to comply with court orders, that Joseph could not provide safe and stable housing or meet Brecklin's daily needs, and that Joseph's incarceration and circumstances surrounding that incarceration complicated DHHS' ability to provide services. While Joseph acknowledged that his incarceration complicated his rehabilitation, he asserted the caseworkers failed to provide opportunities to complete the reunification plan because they failed to communicate with him. The caseworkers admitted to not being in contact with Joseph directly but indicated that Joseph's incarceration made meeting and communicating impossible especially with COVID-19 restrictions.

Garner, Smith, and Joseph generally agreed that their communication with Joseph was poor. According to Joseph, during the 17 months that the case was open, he had only had one contact with Garner and one contact with Smith. He stated that he wrote letters to Garner and Smith but did not receive responses from either party. He also testified that he obtained Smith's telephone number and contacted her via phone on numerous occasions but never received a response. Garner testified that, during her 7 months as caseworker, she only communicated with Joseph two times outside of court hearings. Garner stated that she attempted to send a letter to Joseph but that the letter was returned and that she did not receive a letter from Joseph. Garner indicated that she utilized Joseph's attorney and his mother in order to relay information to Joseph. Smith acknowledged that she did not stay in regular contact with Joseph.

(b) Compliance with Court Orders

The juvenile court ordered Joseph to participate in visitation, participate in individual therapy, complete a psychological and psychiatric evaluation, have no contact with Nicole, enroll in an accredited domestic violence program, participate in relinquishment counseling, and, upon release from incarceration, maintain safe and stable housing and a stable and legal source of income. Both Garner and Smith generally testified that Joseph failed to complete the court-ordered services. Joseph acknowledged that he was aware of the court orders and that his incarceration caused some of the issues in this case, but indicated that the caseworkers failed to assist him with the services he was ordered to complete, failed to refer or set up services for him, and that COVID-19 restrictions at the correctional facility did not prevent referrals or services.

Both Garner and Smith admitted that they did not complete referrals for the ordered psychiatric evaluation initially or for individual therapy or domestic violence programming and did not schedule any family team meetings. Garner and Smith indicated their services were hampered by their communication issues with Joseph. Joseph stated that he voluntarily participated in services that were available to him during his incarceration including a restorative justice class, parenting class, and a domestic violence class. He stated that he signed himself up for these programs without the caseworkers' assistance. He further stated that he planned to continue domestic violence programming and that he was currently in the process of obtaining his diploma through the GED program. Smith acknowledged that Joseph had voluntarily participated in services while incarcerated and demonstrated completion of a restorative justice class and a parenting class.

Joseph successfully completed a psychological evaluation which recommended that he also complete a psychiatric evaluation. Garner testified that they were unable to set up the psychiatric evaluation due to a provider being unavailable to complete the evaluation during Joseph's incarceration. Garner agreed that she did not complete a referral for the psychiatric evaluation which referral was required for the service to be initiated. She testified that the correctional facility did not respond to her inquiries about whether the correctional facility could complete the psychiatric evaluation internally. It was not until after the petition to terminate Joseph's parental rights was filed that Smith completed a referral for Joseph to obtain a psychiatric evaluation which evaluation was scheduled for a date in April 2021.

Joseph acknowledged that he did not always comply with the no contact order regarding Nicole, but stated that he had not had contact with her since July 2020. Joseph testified that he

hoped to be able to work things out with Nicole after his release. Joseph's statement was refuted by the caseworkers and Nicole's probation officer who testified that Joseph and Nicole were having daily contact.

## (c) Visitation

The court ordered that Joseph participate in supervised visitation as arranged by DHHS. Joseph's caseworkers successfully initiated virtual visitation which was permitted by the correctional facility. Joseph testified that he fully complied with the court-ordered visitation. Joseph's actual visitation reports were not made part of the record. Prior to his incarceration and the virtual visitation, Joseph had in-person visits with Brecklin. The foster parent, caseworkers, and visitation advocate acknowledged that Joseph attended all of his scheduled parenting time sessions and did not miss or cancel any of them. Although the record indicates concerns associated with arguments between Nicole and Joseph which took place during in-person visitation with Brecklin, no concerns were reported during Joseph's virtual visitations when allowed to occur.

Joseph's virtual visits with Brecklin continued until March 2020 when visits were suspended due to the COVID-19 pandemic. During the 6 month period of time that COVID-19 restrictions prevented visitation, Joseph sent multiple cards or letters to Brecklin and sent Brecklin a birthday gift. During this time, the foster parent, indicated that she and Joseph had been in more frequent contact since she had downloaded an app which allowed them to communicate via email. During the 2 to 3 month period, she received three emails from Joseph.

After virtual visits resumed in September 2020, Joseph and Brecklin had one virtual visit per week with no reports of missed, cancelled, or concerning visits. A caseworker acknowledged that, although it was hard to keep Brecklin engaged in virtual visits, Joseph attempted to engage with Brecklin despite Brecklin's lack of interest and short attention span. Joseph indicated that he attempted to engage with Brecklin during visits, requested more visits with Brecklin, and never stopped communicating with Brecklin. According to Brecklin's foster parent, after visits with Joseph, Brecklin was clingy and did not run around and play like he normally did on other days. At the time of the termination hearing, Joseph was not currently participating in visits as visitation was not permitted due to his transfer to the work release program through the correctional facility. Joseph was only permitted to participate in visitation if he sought approval from the facility warden and Joseph did not testify to requesting or receiving such permission.

## (d) Best Interests

The caseworkers testified that termination of Joseph's parental rights was in Brecklin's best interests due to Joseph's lack of compliance with court orders; his incarceration which prevents him from providing for, or caring for, Brecklin; his additional convictions of tampering with a witness since being incarcerated; his expected 2024 release date excluding the possibility of an early release or parole; his prior conviction for first degree sexual assault of a minor and status as a registered sex offender; the length of time since Brecklin's removal; and Brecklin's need for permanency and stability.

Although Smith acknowledged that Joseph was attempting to rehabilitate himself while incarcerated and had exhausted his self-help remedies, she testified that Joseph was not fit to parent Brecklin. Smith's opinion was based upon factors including Joseph's incarceration which

prevented him from being able to physically care for Brecklin, Joseph's failure to comply with court orders, and the fact that Joseph could not provide safe and stable housing.

Joseph testified that since his incarceration in October 2019, he had served time in four different facilities and was currently serving in a work release program. According to Joseph, he was completing the work release program's mandatory 30-day probationary program and was scheduled to begin working the following Thursday. Joseph also testified that a parole hearing had been scheduled in October 2021 and, if he were to be released on parole at that time, he planned to continue work, get his own apartment, continue work release programming, and comply with the juvenile court orders including obtaining a psychiatric evaluation.

Beran, a parole officer, testified that, although Joseph was eligible for parole, the parole board ultimately determines whether parole is granted or denied. Beran explained that, in determining whether to grant parole, the parole board generally considers additional charges, prior parole violations, and additional circumstances, although such considerations were not dispositive. Beran also testified that, if an inmate is paroled, the inmate is subject to certain restrictions which are determined on a case-by-case basis. He indicated that individuals on the sex offender registry have restrictions such as not being able to have unsupervised contact with minor children; however, there was an approval process which a parolee can initiate to have the restrictions lifted. Beran explained that granting of parole and the lifting of restrictions was unpredictable.

### 3. ORDER OF TERMINATION

In May 2021, the juvenile court entered an order, as corrected by an order nunc pro tunc, terminating Joseph's parental rights on the basis that there was clear and convincing evidence that Brecklin was a minor child within the meaning of § 43-292(2), (6), (7), and (9) and that termination of Joseph's parental rights was in Brecklin's best interests. Joseph appeals the order terminating his parental rights.

## III. ASSIGNMENTS OF ERROR

Joseph contends that the juvenile court erred in terminating his parental rights because the State failed to prove, by clear and convincing evidence, that Brecklin was a minor child within the meaning of § 43-292(2), (6), (7), and (9) and that termination was in Brecklin's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *Id.*

## V. ANALYSIS

### 1. STATUTORY GROUNDS

Joseph first assigns that the juvenile court erred when it terminated his parental rights pursuant to § 43-292 (2), (6), (7), and (9). Although Joseph argues that the court erred in finding

grounds for termination under § 43-292(2), (6), and (9), he fails to argue that the court erred in finding grounds for termination under § 43-292(7).

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). The State must prove these facts by clear and convincing evidence. *Id*.

We begin our analysis with § 43-292(7) which grants termination of parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." This subsection operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Kenna S., supra*. As stated above, Joseph provides no argument that the juvenile court erred in finding there were grounds to terminate under the statutory subsection.

In this case, Brecklin was removed from Joseph's home on July 11, 2019, and did not return to Joseph's care throughout the duration of the case. At the time of the October 19, 2020, filing of the petition to terminate Joseph's parental rights, Brecklin had been in out-of-home placement for 15 months. At the time of the first day of the termination hearing in March 2021, Brecklin had been in out-of-home placement for 20 months.

Because we find that there was clear and convincing evidence that Brecklin remained in out-of-home care for 15 or more months out of the most recent 22 months, we need not consider whether termination was proper based on the remaining statutory grounds. If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al., supra*.

## 2. BEST INTERESTS

Joseph next contends that the juvenile court erred in determining that termination of his parental rights was in Brecklin's best interests. Specifically, Joseph contends that the State's evidence focused on Joseph's convictions and current incarceration as opposed to Brecklin's well-being, Joseph's continued improvement, or the relationship between Joseph and Brecklin.

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015); *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *In re Interest of Jahon S., supra*. There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of

a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interest analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

In cases where termination of parental rights is based on § 43-292(7), the Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is, in fact, in the child's best interests. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). In such a situation, because the statutory ground for termination does not require proof of such matters as abandonment, neglect, unfitness, or abuse--as the other statutory grounds require--proof that termination of parental rights is in a child's best interests requires clear and convincing evidence of circumstances as compelling and pertinent to a child's best interests as those enumerated in the other subsections of § 43-292. *Id.*

Here, Joseph has been convicted of first degree sexual assault of a minor and is required to register as a sex offender. Joseph was on parole for this offense at the time this case began in July 2019. Joseph's status as a parolee and as a convicted sex offender interfered with his ability to care for Brecklin as was evidenced by the removal of Brecklin from Joseph's care due to his parolee status. Then, in November, Joseph was arrested and charged with, and convicted of, terroristic threats against Nicole. After his arrest, Joseph attempted to prevent Nicole from testifying against him and was subsequently charged with, and convicted of, numerous counts of tampering with a witness.

Although incarceration alone cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). Further, although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id.* Thus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *Id.*

In this case, Joseph's criminal conduct resulted in his incarceration during the majority of this case and he is not expected to be released until 2024 unless he is granted early release or parole. Because of Joseph's criminal history which resulted in his incarceration, which period of incarceration was extended by additional criminal acts occurring after Brecklin was first removed, Brecklin remained in extended out-of-home placement.

The record also depicts a history of domestic violence between Joseph and Nicole. Domestic violence or the continuance of a relationship involving domestic violence is a consideration for termination of parental rights. See *In re Interest of Michael B. et al.*, 8 Neb. App. 411, 594 N.W.2d 674 (1999), *affirmed* 258 Neb. 545, 604 N.W.2d 405 (2000) (continued relationship of parent with abusive partner has been used to uphold termination of parental rights under § 43-292(2)).

Because of Joseph's history of domestic violence with Nicole, which included a threat to Nicole at knifepoint if she would leave him, the juvenile court and the criminal court entered

no-contact orders between Joseph and Nicole. Notwithstanding this history, Joseph defiantly disregarded both courts' orders as the caseworkers and parole officers testified that Joseph continued with daily contact with Nicole, the same person that he threatened at knifepoint and with whom he attempted to tamper in connection with the criminal charge stemming from that incident.

The record also indicated that, in October 2019, Nicole's daughter alleged that Joseph inappropriately touched her and other children. The allegation arose from an incident which occurred when Joseph spent the night with Nicole when Nicole was having unsupervised visitation with her children. The abuse of any child by an adult--regardless of whether it is the adult's own child or the child of another--calls that adult's ability to parent into serious question. *In the Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). When coupled with the fact that Joseph had been previously convicted of first degree sexual assault of a minor, was a registered sex offender, and was convicted of terroristic threats in connection with his threat to Nicole, followed by his conviction for tampering with her, we find that the court did not err in finding that there was clear and convincing evidence that Joseph was unfit to parent Brecklin and that termination of Joseph's parental rights was in Brecklin's best interests. In short, we find it clear on this record that it is not in Brecklin's best interests to force Brecklin into a relationship with a man who has demonstrated extremely dangerous behavior and continues to make choices that result in incarceration which further prevent him from being available in Brecklin's life. See *Wayne G. v. Jacqueline W.*, 21 Neb. App. 551, 842 N.W.2d 125 (2013).

The gravamen of Joseph's argument was that notwithstanding his conduct, he made efforts to visit Brecklin while in prison and that he was not provided with services while in the correctional facility that were designed to rehabilitate him. Although we acknowledge that Joseph participated in visitation with Brecklin, completed some voluntary programs while incarcerated, and continued to remain engaged in some components of the court ordered process, we find more compelling Joseph's conduct governing matters which were completely within his control during the pendency of the entire case.

For instance, following Brecklin's removal from Nicole and placement with Joseph, Brecklin was first removed from Joseph due to his former conviction of sexual assault of a minor. That removal was subsequently extended due to his subsequent terroristic threat upon Nicole. That voluntary act resulted in his incarceration which, of course, hindered his ability to act as a parent to his child. That term of incarceration was then further enhanced by Joseph's attempts to interfere with Nicole which increased the duration of his incarceration and the length of time it would take to act as a parent to his child. And although Joseph advances the argument that he attempted to facilitate the court's orders by voluntarily pursuing some rehabilitative services and visits with his child, his arguments suggesting a desire to comply with court orders and to rehabilitate are impeached by his conduct with Nicole in clear defiance of the court's order to avoid contact with Nicole for the entire duration of the court's order.

Although Joseph took certain steps that would suggest of a desire to reunite with Brecklin, the evidence adduced by the State in this case clearly and convincingly establishes that Joseph is unfit to care for Brecklin, that Joseph has failed to place himself in a position to be able to care for Brecklin, that Joseph continues to pose a danger to Brecklin and his safety, and there is insufficient evidence that would lead this court to conclude Joseph would alleviate our concerns for Brecklin's safety in the foreseeable future. Joseph's actions have adversely impacted Brecklin as Joseph has

been physically absent for nearly the entirety of Brecklin's young life. Brecklin has been in out-of-home placement since he was 6 weeks old and deserves permanency. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Angelina G. et al.*, 20 Neb. App. 646, 830 N.W.2d 512 (2013). Accordingly, we find that there was clear and convincing evidence to establish that Joseph is unfit and that terminating his parental rights is in Brecklin's best interests.

## VI. CONCLUSION

Based upon our de novo review of the record, we find that there was sufficient evidence to support the termination of Joseph's parental rights. Accordingly, the order of termination is affirmed.

AFFIRMED.