In re Interest of Angelina G. et al.,
children under 18 years of age.
State of Nebraska, appellee, v.
Julian G., appellant.
___ N.W.2d ___

Filed April 2, 2013.　Nos. A-12-281 through A-12-284.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
2. **Evidence: Appeal and Error.** When the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other.
3. **Judgments: Appeal and Error.** When an appellate court reviews questions of law, it resolves the questions independently of the lower court's conclusions.
4. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012) provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child.
5. **Parental Rights.** Neb. Rev. Stat. § 43-292(9) (Cum. Supp. 2012) allows for terminating parental rights when the parent of the juvenile has subjected the juvenile or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse.
6. **Parental Rights: Words and Phrases.** The term "aggravated circumstances" embodies the concept that the nature of the abuse or neglect must have been so severe or repetitive that to attempt reunification would jeopardize and compromise the safety of the child and would place the child in a position of unreasonable risk to be reabused.
7. ____: ____. While aggravated circumstances must be determined on a case-by-case basis, where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety, and welfare of the child, they are aggravated to the extent that reasonable efforts of reunification may be bypassed.
8. **Judgments: Minors: Time.** Courts may consider whether the offer or receipt of services would correct the conditions that led to the abuse or neglect of a child within a reasonable time.
9. **Parental Rights.** Parental rights can be terminated only when the court finds that termination is in the child's best interests.
10. ____. A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. With such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort.
11. ____. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights.

12. ____. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity.

13. **Standing: Words and Phrases.** Standing is the legal or equitable right, title, or interest in the subject matter of the controversy.

14. **Actions: Parties: Standing.** The purpose of an inquiry as to standing is to determine whether one has a legally protectable interest or right in the controversy that would benefit by the relief to be granted.

15. **Standing: Claims: Parties.** In order to have standing, a litigant must assert the litigant's own legal rights and interests and cannot rest his or her claim on the legal rights or interests of third parties.

Appeal from the County Court for Scotts Bluff County: Kristen D. Mickey, Judge. Affirmed.

Bernard J. Straetker, Scotts Bluff County Public Defender, for appellant.

Tiffany A. Wasserburger, Deputy Scotts Bluff County Attorney, for appellee.

Lindsay R. Snyder, of Smith, Snyder & Petitt, G.P., guardian ad litem.

Inbody, Chief Judge, and Sievers and Riedmann, Judges.

Riedmann, Judge.

## INTRODUCTION

Julian G. appeals from the decision of the county court for Scotts Bluff County sitting as a juvenile court which terminated his parental rights to his minor children, Phillip G., Angelina G., Adriana G., and Marciano G. The four cases have been consolidated for briefing, argument, and disposition. The issues presented on appeal are (1) whether the State proved by clear and convincing evidence that aggravated circumstances existed, (2) whether the State proved by clear and convincing evidence that termination of Julian's parental rights was in the children's best interests, and (3) whether Julian was prejudiced by the State's filing supplemental juvenile petitions subsequent to trial. We find that the State sufficiently proved the existence of aggravated circumstances and that termination was in the children's best interests. We further find that Julian lacks standing to challenge the supplemental petitions, and therefore, we affirm.

## BACKGROUND

Julian and Peggy T. are the parents of Phillip, born in 1996; Angelina, born in 2000; Adriana, born in 2003; and Marciano, born in 2008. The record reveals a lengthy history of violence in Julian and Peggy's relationship, with police involvement dating back to August 2001.

In August 2001, law enforcement responded to a call at Julian and Peggy's residence. There was a party at the residence and numerous people had been drinking, smoking marijuana, and "huffing" paint. Peggy's oldest child, Roman T., who is not a part of this case; Phillip; and Angelina were present at the residence during the party. A fight broke out, and Julian assaulted Peggy and another man in front of the children. Officers noted that all adults present were intoxicated and in no condition to care for the children. Additionally, marijuana and "huffing" materials were accessible to the children. Officers eventually located Julian walking down a highway at 4 a.m. carrying Angelina, then 1 year old. Julian was very intoxicated and was arrested for assault. As a result of that incident, Roman, Phillip, and Angelina were removed from their parents' home, placed in the custody of the Nebraska Department of Health and Human Services (DHHS), and found to come within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2002).

Due to the ongoing violence in Julian and Peggy's relationship, in July 2002, Peggy applied for and received a protection order against Julian. In her application for the order, Peggy stated, "[My children and I] are afraid for our lives." Despite the protection order, police responded to another domestic disturbance involving Julian and Peggy the following month. After arriving at the family's residence, the officers discovered that Julian had stabbed Peggy in the throat with a steak knife inside the residence where three of their children were present. Julian was arrested and convicted of second degree assault and violating the protection order. Nevertheless, in November, Julian and Peggy requested that the protection order be vacated. The following month, Julian was sentenced to 36 to 60 months in prison for the assault and to 6 months in prison for the protection order violation, sentences to be served concurrently.

After Julian was released from prison, he and Peggy resumed their relationship.

Julian and Peggy were involved in another altercation in September 2005 where law enforcement responded to a complaint of a loud verbal disturbance between the two of them. Julian and Peggy both appeared very intoxicated, and police placed Julian on a civil protective custody hold and transported him to the Scotts Bluff County jail, where he was placed in the "drunk tank" on a minimum 6-hour hold.

In February 2006, Julian was arrested for driving under the influence. Julian had a previous conviction for driving under the influence from July 2001. Two months later, in April 2006, police responded to another incident at Julian and Peggy's residence. During an argument, Julian spit in Peggy's face and threw rocks at her, hitting her in the back of the head. Peggy locked herself inside the house, and Julian began pounding on the doors and windows. There were young children inside the home at the time. Police arrested Julian for domestic assault. As a result of this incident, Adriana was removed from the home and placed in the custody of DHHS and Roman, Phillip, and Angelina were returned to DHHS' custody.

In August 2007, Julian was convicted on another charge of driving under the influence. In August 2008, Phillip, Angelina, and Adriana were returned to their mother's care, and their cases were closed in January 2009. During the 7-year period that the children were in the custody of DHHS, numerous services were provided to Julian and Peggy, including but not limited to case management services; drug and alcohol evaluations; daycare services; individual therapy; aftercare programs; group therapy; assistance with paperwork; Alcoholics Anonymous and Narcotics Anonymous classes for support groups; parenting classes; supervised visitation; intensive family preservation services; protection orders; anger management services; visits by law enforcement; marriage counseling; family therapy; psychological service evaluation; gas vouchers; transportation; and assistance paying for groceries, gas and electric bills, clothing, household supplies, and rent. Despite this, the family made very little progress between 2001 and 2008.

Shortly after the children were returned to Peggy, she and the children moved to Texas to escape from Julian, but Julian discovered where they had gone and followed them to Texas. Peggy reunited with Julian while living in Texas because he told her he had changed and she believed him. In early 2011, while the family was still living in Texas, Julian was involved in an argument with Roman and hit Roman in the head with a crowbar. After this incident, Peggy left Julian and moved back to Nebraska with the children.

Once back in Nebraska, Peggy applied for an ex parte protection order against Julian in March 2011. In her application, Peggy stated that Julian followed her and the children back to Nebraska and that he "continue[d] to [harass] and stalk" them. Peggy also stated that Julian continued to harass her family by telephone and threatened to "leav[e] the state with [their] boy[s]." In the application, Peggy recounted an incident in February where Phillip was hospitalized and she called hospital security because Julian "threatened several times with his hands pretending to shoot and kill [Peggy]." Peggy stated, "I do not feel safe without turning my back and thinking he is there to attack." The protection order was issued, but Julian was never located for service, and in August, the parties requested that the ex parte order be vacated.

In April 2011, Julian and Peggy were both arrested for domestic assault after an argument at a park. Julian and Peggy were sitting in their van when Julian got upset, took away Peggy's telephone, and "ripped the glasses off of her face," breaking the glasses and scratching her face. After they both got out of the van, Peggy hit Julian twice in the face while he was holding Marciano.

Three months later, in July 2011, the family went to a lake to celebrate Marciano's third birthday. Julian and Peggy were involved in another argument, and when Peggy said she was going to take the car and leave, Julian, in front of the children, threatened to burn the car. Angelina testified at trial that Julian's threat made her feel scared because she did not know what would happen. As a result of this incident at the lake, the court ordered that the minor children be placed in the temporary custody of DHHS. Currently, Julian and Peggy have

visits with Adriana and Marciano, but Phillip and Angelina refuse to go on visits.

On October 11, 2011, the State filed second amended motions to terminate Julian's and Peggy's parental rights as to all four minor children. The termination hearing was held January 9 and 20, 2012. The State presented numerous witnesses, including Angelina, who testified that Julian and Peggy are "mean," that they do not treat her and her siblings "right," and that Julian calls her names like "bitch."

Angelina recalled an incident where Julian put Marciano "in the dryer" when Marciano was just 1 or 2 years old, which made Angelina feel scared. Angelina and Adriana pushed Julian away to help Marciano, but Julian pushed them back. Angelina stated that Julian would also throw toys at Marciano, which made Marciano cry. Angelina testified that she does not feel safe living with Julian because he does not treat her and her siblings "right" and that she would not feel safe if she had to live with him again because she would "have to go through everything [all] over again."

Jeanna Townsend, a licensed mental health practitioner and certified professional counselor, also testified. Townsend worked with Phillip, Angelina, and Adriana for several sessions each. Townsend stated that she has never met a child as angry, hostile, and homicidally inclined as Phillip. She observed that Phillip does not want a relationship with either of his parents and that any mention of his parents makes him "incredibly angry."

Townsend observed signs that Phillip had been exposed to violence in his parents' home. Specifically, she observed the symptoms typically associated with posttraumatic stress disorder, including an effort to avoid any discussion about his parents or any discussion regarding physical violence, and incredible agitation at the mention of his parents or any of the historical violence in his family. In addition, Phillip has exhibited violent behaviors toward small children; he had reportedly made threats against school personnel, specifically male authority figures; and he was "in a chronic state of agitation . . . where he was just looking for the next moment that he would have to fight." Based on her training and experience,

Townsend stated Phillip's symptoms were typical of exposure to violence in the home. Townsend opined that it would be harmful to Phillip if he were returned to his parents' care because returning him to the same environment would be returning him to a place that would continue to traumatize him psychologically.

Townsend observed that Angelina presented as a traumatized child and was very depressed. Angelina wanted absolutely no contact with her parents, which is not a normal response Townsend sees from children. Angelina appeared to be functioning better insofar as she had been removed from the stressor, presumed to be her parents. Townsend believed it would be harmful to Angelina to be returned to her parents' care because she seemed to be using all of her strength to keep things together, and Angelina had expressed that she did not think she could take being in the family home any longer.

Townsend noted that neither Phillip nor Angelina showed signs of normal bonding with their parents. It was significant to Townsend that Phillip and Angelina wanted no contact or interaction with their parents because most children, on some level, still want some relationship with their parents regardless of the level of abuse they have endured. This, Townsend testified, indicated chronic and ongoing severe abuse or trauma.

Townsend observed that Adriana was struggling with emotional difficulty which most children suffer when removed from their home but that there was no indication Adriana had been traumatized. Adriana, because of her age, felt more connected to her parents and was still at an age where she desired a relationship with her parents.

Townsend expressed concern, however, that if Adriana is returned home and the conditions remain the same, she will grow up to believe that violent interaction is the norm and might emulate those behaviors. Townsend testified that if the conditions at home remain the same, it would be harmful for Adriana to return home, because she worries about Adriana's continuing the cycle of violence whether as the victim or as an aggressor. Townsend diagnosed Adriana with adjustment disorder with depressed mood, which means that when Adriana

is in the presence of a stressor, her mood is depressed and she feels helpless and despondent, but when the stressor is removed, there is improvement in her mood.

Townsend noted that chronic exposure to domestic violence and substance abuse adversely affects children because they learn to cope negatively, they learn maladjustive ways of dealing with stress and relationships, they are likely to identify with either the abuser or the victim and perpetuate such relationships throughout their lives, and they are more likely to suffer from depression, anger outbursts, criminal activity, and substance abuse. In Townsend's opinion, terminating Julian's parental rights to Phillip, Angelina, and Adriana would be in the children's best interests.

Dr. Matthew Hutt, a licensed psychologist who conducted mental status evaluations on Phillip, Angelina, and Adriana, also testified. Dr. Hutt stated that Phillip's mood became more dark and angry when Phillip was asked about his parents. Phillip indicated that he preferred not to have any contact with his parents. Dr. Hutt diagnosed Phillip with anxiety disorder, not otherwise specified. Angelina acknowledged a sense of anger and resentment toward her parents similar to Phillip's. Dr. Hutt diagnosed Angelina with adjustment disorder, not otherwise specified. Adriana reported to Dr. Hutt that she felt safe in her current environment with her maternal aunt and denied any sadness, despondency, or anger. Dr. Hutt diagnosed Adriana with adjustment disorder, not otherwise specified.

The court also heard testimony from Katherine Batt, a children and family services supervisor with DHHS who supervised Julian and Peggy's case. Batt testified that Julian would consistently follow through with services provided by DHHS for 3 or 4 weeks, but never longer than that. More significantly, Julian had never been able to admit any wrongdoing and did not think he had a problem, which had been a roadblock in the progression of the case. Ultimately, Batt opined that terminating Julian's parental rights would be in the best interests of the children because, despite services offered to the family, Julian and Peggy continued to have a very violent relationship, the children were fearful of their parents, and DHHS had been

involved with the family for over 11 years by offering services to them, but they had been noncompliant.

Rickie Wynne, a children and family services specialist with DHHS, also testified. When the current case was opened in August 2011, Wynne interviewed Julian and Peggy, and they both blamed DHHS' current involvement on the two older children, claiming that Phillip and Angelina were out of control and lying. Julian and Peggy indicated they were not willing to participate in the services provided by DHHS because they had "'already done all of this stuff'" and did not understand why they should be expected to do it again.

In September 2011, Julian's and Peggy's visits with Adriana and Marciano were separate because Peggy had a protection order against Julian, and Wynne recounted an incident where Peggy's visit had to be moved to a different location because Julian showed up during Peggy's visit and started shouting at her through her car windows with the children present. After that, Peggy's visits had to be held at a center for supervised visitation and family support for several months to protect her visits from Julian.

The court also heard testimony from two visitation aides who testified that Julian generally showed up for his visits and was on time, that he was good with the children, and that he and the children always seemed excited to see each other.

Julian testified in his own behalf during the termination hearing. When asked about his discipline practices, Julian testified that he never touched his children physically. When asked again, he stated that he has "tapped" them, which means "like a slap on the hand, you know, a tap on the rear." He stated that he has yelled at the children quite a bit but never threatened them. However, on cross-examination, Julian admitted that he told Wynne that he has threatened to "beat the kids' asses," stating, "[W]ho hasn't heard that from their parent?"

When asked about his relationship with Peggy, Julian replied that their relationship is "no worse or better than most others. It's pretty good, as far as the relationship." When asked what steps he has taken to address the issues of domestic violence in his relationship with Peggy, Julian stated, "I don't believe I need to. I'm sorry, I don't. I haven't taken any."

Overall, Julian tended to either downplay or outright deny many of the events described above. When asked about the incident in the hospital when Peggy called security, Julian stated, "Security was called because she wanted to call them." Julian denied putting Marciano in the dryer, stating that it was Angelina and Adriana who were trying to put Marciano in the dryer and that Julian had to discipline them for doing so. Julian testified that the incidents where he threw rocks and spit at Peggy and where he hit Roman in the head with a crowbar "didn't happen."

The court also heard testimony from Peggy. Peggy admitted that her relationship with Julian was violent and that sometimes the violence occurred in front of the children. Peggy stated that Julian cannot control his anger. Peggy did not think the children would be safe with her and Julian because Julian does not think he has a problem, but he is the one who "causes everything."

Peggy arrived to court on the second day of the hearing with a black eye as a result of an incident that occurred on January 13, 2012, between the 2 days of trial. Scottsbluff police responded to the incident and found Peggy, who was very intoxicated, with a black eye. Peggy told police that she and Julian began arguing, she hit him twice, and then he punched her in the eye. Julian told police that Peggy had gotten into a fight with his mother and that his mother had given Peggy the black eye. Police noted that Julian's mother also had a black eye. A few days later, Julian told Batt during a team meeting that he had not caused Peggy's injuries, that he was tired of covering for Peggy, and that Peggy is the one who beats him.

At trial, Peggy testified that Julian had given her the black eye and that after the incident, she contacted police, moved into a women's shelter, and obtained a protection order against Julian. Peggy testified that she was not going to go back to Julian again and stated that she was afraid of Julian because he has threatened to kill her.

After all parties had rested at trial, the State requested to withdraw the motion to terminate Peggy's parental rights to Adriana and Marciano and file a "fault petition" for each under

§ 43-247(3)(a) (Reissue 2008) instead. Peggy indicated that she agreed to this amendment. Julian objected to the timing of the amended petition because all the evidence had already been presented and all parties had rested. The court noted the objection but allowed the State to file first supplemental juvenile court petitions for Adriana and Marciano on January 30, 2012, alleging they were children within the meaning of § 43-247(3)(a).

In an order dated February 29, 2012, the court terminated Julian's parental rights to Phillip, Angelina, Adriana, and Marciano. The court noted that the evidence presented at the termination hearing showed a history of more than 10 years of various incidents exposing the children to domestic violence, alcohol abuse, physical violence, threats of physical violence, and a failure to protect the children. The court also noted that the record includes a documented history of prior interventions by DHHS because of issues of substance abuse and domestic violence. Overall, the court found by clear and convincing evidence that the substantial history of violent domestic disputes between Julian and Peggy over the course of more than 10 years, the exposure of the minor children thereto, and the parents' failure to protect the minor children constitute chronic abuse.

The court found the credibility of Julian's testimony was suspect in view of his argumentative nature and confrontational behavior throughout the course of trial. The court noted the "astonishing absence" of any accountability on his part for his history of violent behavior or recognition of anything abnormal about that history, and his aggressive and inappropriate reactions to caseworkers and law enforcement attempting to intervene on behalf of the children. The court found the testimony of Angelina, Townsend, Dr. Hutt, and Batt to be "extraordinarily compelling" in support of a finding that termination of parental rights is in the children's best interests. Regarding Julian specifically, the court found there was an absence of evidence indicating the likelihood of significant rehabilitation of his behavior anytime in the foreseeable future. Julian timely appeals.

In the February 29, 2012, order, the court also terminated Peggy's parental rights to Phillip and Angelina. Peggy did not appeal the decision.

## ASSIGNMENTS OF ERROR

Julian asserts the juvenile court erred in (1) failing to establish by clear and convincing evidence that the children were subjected to aggravated circumstances as set out in Neb. Rev. Stat. § 43-292(9) (Cum. Supp. 2012), (2) permitting the State to file first supplemental juvenile court petitions in the cases involving Adriana and Marciano after the State rested its case during trial and after the court adjourned the trial and prior to the issuance of the court's order ruling on the merits of the second amended motions to terminate parental rights, and (3) finding that the State had established by clear and convincing evidence that termination of Julian's parental rights was in the best interests of the children.

## STANDARD OF REVIEW

[1,2] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. See *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *Id*.

[3] When an appellate court reviews questions of law, it resolves the questions independently of the lower court's conclusions. *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007).

## ANALYSIS

*Grounds for Termination*.

[4] The bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is

in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

[5] In its order terminating Julian's parental rights, the juvenile court found by clear and convincing evidence that the minor children are within the meaning of § 43-292(9) and that it is in the children's best interests that Julian's parental rights be terminated. Section 43-292(9) allows for terminating parental rights when "[t]he parent of the juvenile has subjected the juvenile or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse."

[6-8] The term "aggravated circumstances" embodies the concept that the nature of the abuse or neglect must have been so severe or repetitive that to attempt reunification would jeopardize and compromise the safety of the child and would place the child in a position of unreasonable risk to be reabused. See *In re Interest of Jac'Quez N.*, 266 Neb. 782, 669 N.W.2d 429 (2003). While aggravated circumstances must be determined on a case-by-case basis, where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety, and welfare of the child, they are aggravated to the extent that reasonable efforts of reunification may be bypassed. *Id.* Courts may also consider whether the offer or receipt of services would correct the conditions that led to the abuse or neglect of a child within a reasonable time. *Id.*

While aggravated circumstances have not yet been found in a situation like the present case, we conclude on our de novo review that the evidence clearly and convincingly establishes the children were subject to chronic abuse in the form of repeated exposure to domestic violence.

The record sets out the violent history of Julian and Peggy's relationship, with many incidents occurring in the presence of their children. Townsend and Dr. Hutt testified that this repeated exposure to violence has caused psychological damage to the children, particularly Phillip and Angelina, and that returning them to the same environment would cause further damage. Even though there was no evidence that

Adriana and Marciano have been as negatively impacted by the exposure to violence, § 43-292(9) allows for termination of parental rights if the juvenile *or another minor child* has been subjected to aggravated circumstances. Thus, the evidence as to the trauma sustained by Phillip and Angelina is sufficient to terminate Julian's parental rights to Adriana and Marciano as well.

We find it compelling that Julian blamed Phillip and Angelina for DHHS' current involvement with the family and refused to acknowledge any abnormality or problems in his relationship with Peggy. Because Julian indicated he would not accept services offered by DHHS, we cannot find that the conditions which led to the chronic abuse would be corrected in a reasonable amount of time, particularly in light of the fact that the family previously received DHHS services for 89 months and made very little progress in that time.

We also cannot find that the current conditions would be corrected based on Peggy's testimony that she ended her relationship with Julian and will not return to him. The history of the relationship is compelling, especially Peggy's history of ending the relationship, obtaining a protection order, and then returning to Julian and moving to vacate the order.

Our de novo review of the record shows that grounds for termination of Julian's parental rights under § 43-292(9) were proved by clear and convincing evidence. Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the children's best interests.

*Best Interests.*

[9-12] Section 43-292 requires that parental rights can be terminated only when the court finds that termination is in the child's best interests. A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. See *In re Interest of Crystal C.*, 12 Neb. App. 458, 676 N.W.2d 378 (2004). Therefore, given such severe and final consequences, parental rights should be terminated only "'[i]n the absence of any reasonable alternative and as the last resort . . . .'" See *In re*

*Interest of Kantril P. & Chenelle P.*, 257 Neb. 450, 467, 598 N.W.2d 729, 741 (1999). However,

> [w]here a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Phyllisa B.*, 265 Neb. 53, 654 N.W.2d 738 (2002).

*In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 717, 684 N.W.2d 594, 602 (2004).

The evidence reveals the children were initially placed in the custody of DHHS in 2001 due to domestic violence occurring in front of the children. Despite numerous services offered to Julian and Peggy from 2001 to 2008, the family made very little progress and Julian and Peggy's relationship remained virtually unchanged. The children were placed in DHHS' custody again, resulting in the present case after another incident of violence in their presence.

Townsend opined that terminating Julian's parental rights would be in the best interests of the children because the children have already been psychologically traumatized by the repeated exposure to domestic violence and returning them to the same environment would continue to damage them and potentially continue the cycle of violence with them as either abusers or victims. Batt also opined that terminating Julian's parental rights would be in the children's best interests because Julian and Peggy continue to have a very violent relationship, the children are fearful of their parents, and the family made very little progress during DHHS' prior involvement.

Additionally, Julian and Peggy blame Phillip and Angelina for DHHS' current involvement and deny any wrongdoing. They both indicated they were not willing to participate in services provided by DHHS because they had already done so and did not understand why they would have to do so again.

The evidence is clear that it is in the best interests of the children that Julian's parental rights be terminated.

*Supplemental Juvenile Petitions.*

Julian asserts the juvenile court erred in allowing the State to file first supplemental juvenile court petitions as to Adriana and Marciano after the State rested at trial. The State argues Julian lacks standing to challenge the supplemental petitions. We agree.

[13-15] Standing is the legal or equitable right, title, or interest in the subject matter of the controversy. *County of Sarpy v. City of Gretna*, 267 Neb. 943, 678 N.W.2d 740 (2004). The purpose of an inquiry as to standing is to determine whether one has a legally protectable interest or right in the controversy that would benefit by the relief to be granted. *Id*. In order to have standing, a litigant must assert the litigant's own legal rights and interests and cannot rest his or her claim on the legal rights or interests of third parties. *Id*.

In the present case, the State made an offer to both Julian and Peggy to dismiss the second amended motions to terminate parental rights to Adriana and Marciano and file a "fault petition" for each under § 43-247(3)(a) instead. Peggy agreed, but Julian did not. Thus, the State proceeded with its motions to terminate Julian's parental rights as to all of the children. Julian was not affected or prejudiced by the State's agreement with Peggy. Therefore, Julian lacks standing on appeal to challenge the State's supplemental petitions.

## CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Julian's parental rights to Phillip, Angelina, Adriana, and Marciano.

Affirmed.