IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF LAMIAH L. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF LAMIAH L. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ROGER L., APPELLANT, AND MICHELLE B., APPELLEE.

Filed June 21, 2022.    Nos. A-21-893 through A-21-896, A-21-916, A-21-917.

Appeals from the County Court for Scotts Bluff County: KRIS D. MICKEY, Judge.
Affirmed.

Rhonda R. Flower, of Law Office of Rhonda R. Flower, for appellant.

Travis R. Rodak, Deputy Scotts Bluff County Attorney, for appellee State of Nebraska.

Leonard G. Tabor for appellee Michelle B.

PIRTLE, Chief Judge, and BISHOP and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

This appeal arises out of a consolidated order of the Scotts Bluff County Court, sitting in its capacity as a juvenile court, which terminated Roger L.'s parental rights to his four children. Michelle B., who is the mother of Roger's four children and the mother of two other children by a different father, filed a brief of appellee contesting the termination of her parental rights to all six children. Both parents argue that the court erred in finding that statutory grounds under Neb. Rev. Stat. § 43-292 (Reissue 2016) existed and that termination of their parental rights was in the minor children's best interests. For the reasons stated herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. FACTS LEADING TO REMOVAL

Roger and Michelle are the biological parents of Roger L. III (Trey), born in 2017; Marian L., born in 2018; and twins Lamiah L. and Leon L., born in 2019. Relevant to this appeal, Michelle is also the biological mother of two other children, Elihu A., born in 2011 and Elias A., born in 2014. The biological father of Elihu and Elias has not appealed the termination of his parental rights.

In mid-May 2021, Michelle came to Nebraska from South Dakota with her six children; her sister, Pauline P.; and Pauline's three children. Michelle had left a South Dakota domestic violence shelter and was attempting to work with a Nebraska domestic violence shelter in Nebraska. After being in Nebraska for about two days, Michelle contacted Department of Health and Human Services (DHHS) worker Courtney Armstrong requesting Armstrong's help. Michelle told Armstrong, with whom she had previous contacts, that neither she, nor Pauline, were able to care for the children because Michelle was incarcerated and Pauline was in poor health. This situation was reported to the child abuse hotline which intake revealed that Michelle and her six children were homeless and were living in a minivan with Pauline and Pauline's three children. In response to this report, Chasity Duarte, a Nebraska Child and Family Service (CFS) specialist, located Pauline, Pauline's three children, and Michelle's six children in Pauline's minivan. According to Duarte, the minivan was filled with trash; the children were dirty and hungry; Pauline, who was awaiting a liver transplant, had to return to South Dakota; and Pauline did not have the means to care for Michelle's children. Duarte observed that 4-year-old Trey was nonverbal and was not potty-trained and that all six children had very poor hygiene, did not have appropriate clothing, and four of the children did not have any shoes.

Based on Duarte's investigation, which included contacting family members for information, Duarte identified three active safety threats: (1) Michelle was incarcerated and unable to care for her children's needs for supervision, food, clothing, and medical or mental health; (2) the caregiver had deserted the children; and (3) a pattern of prior DHHS investigations, protective placements, and current circumstances placed the children at risk for other safety threats. Duarte indicated that the children had been placed in unsafe situations and did not have safe living arrangements as evidenced by domestic violence and substance abuse concerns. Based upon Duarte's conclusion that it was necessary to take the children into temporary protective custody because of serious threats to the children's health, safety, and welfare, the children were placed on a 48-hour police hold.

On May 21, 2021, the State sought custody of the minor children by way of a motion accompanied by Duarte's affidavit which set forth facts as previously set forth. Duarte's affidavit also set forth that Elihu was the only one of Michelle's children who was able to communicate clearly and that Elihu disclosed, among other things, that the South Dakota shelter was the only place he had a bed; that Michelle consistently drank alcohol; and that Roger, the biological father of Elihu's four youngest siblings, was mean, hit them, and made the children fight each other. Elihu, who was the age of a fourth-grade student, indicated that he had not been to school since the second grade and that Michelle told the children that they did not have to attend school. During

the time that Elihu had attended school, he had an Individual Education Plan (IEP) to facilitate his speech development, but those needs had not been met since he stopped attending school. The other children were either nonverbal or unable to communicate effectively and had not been receiving services to address their needs. Through the course of her investigation, Duarte learned that the family had been involved in prior CFS cases during which some of the children had been made wards of the State; during the pendency of the prior cases, Michelle and Roger resided together; and the prior case commenced after Michelle gave birth to Lamiah and Leon following a positive test for methamphetamine.

## 2. Court Proceedings

On May 21, 2021, the State filed a petition seeking to adjudicate all six children as juveniles under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The petition alleged that the children were of Native American heritage and came within the provisions of the Indian Child Welfare Act (ICWA). In the State's petition in support of custody of the minor children, the State asserted that the children lacked proper parental care by reason of the faults or habits of the parents as the children lacked safe and stable housing; that Roger had abandoned the children; and that Michelle failed to meet the children's basic needs, was incarcerated and unable to care for the children, and used alcohol or other controlled substances placing the juveniles at risk of harm. Both Roger and Michelle entered denials to the State's allegations and the matter was set for an adjudication hearing.

In early July 2021, while the adjudication was pending, the State filed a motion to terminate both parents' rights to their respective children. The State alleged that termination of Roger's parental rights was appropriate under § 43-292(1) (abandonment for six months or more), § 43-292(2) (substantial and continuous or repeated neglect and refusal to give necessary parental care and protection), and § 43-292(9) (aggravated circumstances). The motion to terminate Michelle's parental rights alleged termination was proper under § 43-292(2) and (9). Additionally, prior to the combined adjudication and termination hearing, the children's guardian ad litem filed a motion to suspend the parents' visitation with the minor children. The motion was heard on September 16 in conjunction with the combined adjudication and termination hearing.

## 3. Combined Hearing

At the combined hearing, the State called multiple witnesses including Courtney Armstrong, the family's prior CFS supervisor; Chasity Duarte, the family's current CFS specialist and the area's ICWA specialist; several of the children's medical, dental, and mental health providers; Kylie C., foster parent of Elihu, Elias, Roger and Marian; and Elisa M., foster parent for Leon and Lamiah. The court received additional evidence from the State consisting of prior family intakes, prior court orders, the parents' criminal histories, images of the children taken by the foster parents, and a letter written by Michelle addressed to the court.

### (a) Current Case

Duarte, the CFS specialist assigned to the current case on May 19, 2021, testified that she was the ICWA specialist for the area. Duarte testified to facts consistent with those previously

described in her affidavit submitted in support of removal of the minor children. According to Duarte, she had very little success contacting Roger and Michelle and that contact with the parents was inconsistent. At the time of the combined adjudication and termination hearing, Duarte had not heard from Roger for an extended period of time and finally heard from him the day before the hearing when he sought information about his court hearing. Duarte testified that her communication with Michelle was nonexistent. Despite the lack of communication, Duarte was able to complete family findings, complete a referral for family support with Native Futures, complete a family strengths and needs assessment, schedule parenting classes for Roger, refer Roger and Michelle for substance abuse and mental health evaluations, provide supervised visitation services, provide clothing vouchers, provide gas vouchers for Roger, refer Roger for extra family support work, utilize a kinship home for Leon and Lamiah, and was in the process of setting up Early Development Network services for the children.

Duarte testified that Michelle and Roger were both offered supervised visitation with their children. Michelle attended only 21 of 40 visits and failed to engage with the children during her visits. According to Duarte, Roger attended ten of 37 visits, his visits were inconsistent, and he appeared to lack a relationship with the children. According to the foster parents, Roger and Michelle's inconsistency resulted in the children exhibiting negative behaviors and Elihu's therapist reported that Elihu had self-harming thoughts after missed visits because he wanted to punish himself for his parents' missed visits. Additionally, the foster parents indicated that the children often became angry and sad while waiting for confirmed video visits that Roger and Michelle failed to attend.

The children presented with both significant mental and physical health conditions. Edward Sydow, the physician's assistant who has treated Leon and Lamiah, testified that Michelle and Roger failed to bring Leon and Lamiah for wellness checkups except for their 2-week and 4-month check-ups and one sick visit in February 2020 during which he diagnosed the children with bronchiolitis. Sydow noted extensive dental issues including cavities, speech and developmental delays, abnormal blood tests, infections, moderate to severe anemia, and iron deficiencies. Additionally, during the February 2020 sick visit, when he exited the room to obtain a pulse oximetry test to ensure that the children were oxygenating well and that it was safe for them to go home, the parents abruptly left the facility. Leon and Lamiah's dentist testified that both children had misshapen incisors, that Leon had moderate tooth decay, and that both children had cavities.

Dr. Marvin Swan, a dentist, saw Trey in his office for an emergency visit after Trey's face became swollen. Following an examination, Dr. Swan observed that Trey presented with a "fairly significant swollen face" and determined that Trey had a "bad, bad tooth with large decay and . . . an abscess" and that the infection was so severe it had broken through the bone of Trey's buccal plate and infected his cheek area. Dr. Swan indicated that, in some cases, an untreated abscess could result in death. Trey's ongoing pediatric dentist, Dr. Jonathan Simpson, similarly testified that Trey had extensive dental needs including significant decay and infected and nonrestorable teeth. He explained that

> Nonrestorable means the decay extended past the structural integrity of the tooth to support either a crown or a filling. And then infected would include bone loss due to an

- 4 -

infection spreading from the tooth into adjacent bone or root loss of the decay reaching the nerve, and, therefore, infiltrating the nerve and the remainder of the tooth.

Dr. Simpson testified that, of the 20 teeth in Trey's mouth at that time, 15 teeth had decay, nine of which were nonrestorable or infected and had to be extracted. Additionally, Trey received 3 fillings, 3 crowns, and 1 pulpotomy, which is nerve therapy.

In addition to evidence adduced as previously set forth, both the mental health therapists and the foster parents reported significant concerns with the children's emotional wellbeing. The record shows that Elias and Elihu had attachment disorders; Elihu suffered from anxiety, depression, and self-harming thoughts; and Marian had self-harming behaviors including banging her head on the walls and floors until she bled and attention-seeking behaviors including intentionally slamming her fingers in a drawer and screaming until she became hoarse. Both foster parents reported that the children had eating complexes such as hoarding food, eating until sick, standing in or staring at the kitchen, and always asking about when they would eat next.

(b) Previous Intakes

In addition to the current May 2021 intake, the family also had several previous intakes. Armstrong, a DHHS child and family services specialist supervisor, supervised prior cases involving the family from November 2017 to January 2019.

Armstrong testified that prior to her becoming involved in the case, Elias and Elihu had been state wards from April to October 2016 after law enforcement, while executing a search warrant, found marijuana in Michelle's purse. Michelle admitted to law enforcement that she was snorting one of her prescription medications and had smoked marijuana in front of the minor children immediately prior to law enforcement arriving at the home. Additionally, Michelle breastfed 2-year-old Elias while law enforcement was present in the home. At that time, the home lacked electricity and water. Also in 2016, a visibly intoxicated Michelle took Elihu, then 5 years old, to the emergency room for an infection in his groin which, if left untreated, could have spread to his testicles and caused infertility.

The first intake in which Armstrong was involved occurred in November 2017 after Elihu and Elias were located sleeping in the backseat of Michelle's vehicle while Michelle was intoxicated and passed out in the vehicle with the ignition on and the car in drive. Michelle was arrested and Elihu and Elias were placed with Roger. At that time, Armstrong was concerned with the children's overall well-being due to Michelle's history of alcohol and substance abuse and history of neglecting her children.

The next intake occurred in March 2019 after Michelle overdosed while caring for 5-month-old Marian who was hospitalized with a serious ear infection that had spread into her skull, a rash on her ears and neck, and a severe diaper rash. The infection had to be drained with a scalpel and packed. After hospital staff noticed that there was water pouring out of Marian's hospital room, Michelle was found passed out in the shower blocking the drain. Hospital staff found crushed-up medication on the sink. At that time, Roger reported observing it was normal to see Michelle crush up medications, mix them, and take as many as she wanted.

The next intake occurred in October 2019 after Michelle tested positive for THC and methamphetamines at the hospital the day she gave birth to her twins. Michelle admitted to using alcohol and THC during her pregnancy and that she did not begin prenatal care until she was 33 weeks into her pregnancy. Michelle also stated her intention to breastfeed despite positive drug tests and that she was unprepared to take the twins home. Law enforcement, while executing a search warrant at Michelle and Roger's home, found a marijuana pipe, a grinder, and a straw which appeared to have cocaine residue on it.

Armstrong testified that, during the time that she supervised the case, the active efforts provided to the family specifically included multiple notices and monthly contact with the tribe; efforts to place the children with culturally compliant foster homes; search for family members to assist with the family; weekly contact with Michelle; team meetings; case management; family support; monthly home visits; family strengths and needs assessments; risk assessments; in-home family support; safety assessments and planning; monthly maintenance payments for foster care; daycare assistance; purchase of clothes, shoes, diapers, and other basic necessities for the children; multiple lice treatments; transportation; car repairs; meals for visitations; and weekly drug testing. Additional services provided to the family included utility payments; gas vouchers; grocery vouchers; hotel vouchers; case planning; evaluations including a substance abuse evaluation; referral to Circle of Security; and a SCRAM continuous alcohol monitor provided to Michelle.

Armstrong testified that her "big-picture concerns" in this case included the overall lack of consistency; the severe neglect that was noted through DHHS' history with the family; both Roger and Michelle's incarcerations; Michelle's marijuana use and excessive alcohol use; Michelle's tampering with SCRAM monitors; failure to participate in alcohol and substance use testing; and lack of food, utilities, and basic necessities for the children. Armstrong also listed additional concerns including the removal of Michelle's SCRAM monitor due to her high alcohol usage and tampering with the device; Michelle's consumption of alcohol during her pregnancy and lack of prenatal care; Michelle's failure to cooperate with probation; Michelle's failure to complete Circle of Security; and Michelle's failure to follow through on the substance abuse recommendation that she attend treatment.

(c) Best Interests Testimony

*(i) Duarte*

Duarte testified that, in her opinion, termination of Roger and Michelle's parental rights was in the children's best interests due to their lack of participation in the case, their extensive history and involvement with DHHS, the children's extensive needs and concerns at the time they reentered DHHS' care including their developmental and physical delays, and Roger and Michelle's failure to meet the children's educational needs.

*(ii) Kylie C.*

Kylie C. testified that she has been the foster mother for Elihu, Elias, Trey, and Marian, since May 19, 2021. According to Kylie, when the children came into her care, they had ill-fitting clothes, only two children had shoes, the children smelled as if they had not bathed, Trey did not make eye contact, only Elias and Elihu were verbal but Elias had a stutter that made him difficult

to understand, none of the children knew how to use utensils, and Elihu acted in "almost a parent role for his siblings." The first week Trey and Marian "would just grunt" and then Kylie realized that they did not know words. Kylie described Trey as "really quiet" and that he would not look her in the eyes. Kylie described Marian as quiet and reserved at first and had very bad cavities which were subsequently addressed. Additionally, Marian was eating dirt, books, and colored pencils.

While in foster care, Kylie noted that the children "have really transitioned very easily. They have been very, very good about taking on the new . . . rules and the new norm. . . . it was pretty quick that they realized as soon as we got home from day care . . . they were getting ready to sit down to eat." Kylie stated that "[i]t wasn't until we started scheduling visits that really we started seeing some behaviors come out." She explained that when Michelle or Roger would have a Zoom visit set up "the kids would sit there, and they would wait and they would wait and they would wait and they would wait . . . [a]nd . . . you could just see them starting to fall apart." Behaviors included inability to focus and not listening and Elihu was having problems with self-punishment thoughts because "he was trying to punish himself for [Michelle and Roger] not making his calls." However, since beginning counseling, Elihu was doing "phenomenal" with journaling.

Kylie testified that, after being in foster care for four months, Elihu was attending third grade and doing "very well," had lots of friends, and was involved in flag football and soccer.

Kylie described Elias as a 7-year-old kindergartener who was "struggling" so they had started an IEP evaluation and testing. Elias also received private tutoring over the summer. However, he has developed into "a busy kid," will ask questions, and engage in in-depth talks.

Marian was starting counseling after exhibiting self-harming behaviors including banging her had against the floor and wall, throwing things, scratching things, and screaming until she was hoarse up to four hours at a time. After bloodwork determined that Marian was iron deficient and anemic, steps were taken to alleviate the conditions and thereafter, Kylie described that Marian no longer ate dirt, books, or colored pencils.

Kylie explained that Trey was very delayed and had difficulty with comprehension but did very well with routines. She noted that after Trey had dental work performed and had his tonsils and adenoids removed, he was "a different kid" who is babbling, wanting to learn, wanting to run and play, and laughing at the TV.

*(iii) Elisa M.*

Elisa M. testified that she is employed with the Early Head Start program and has been Leon and Lamiah's foster mother since May 19, 2021. Elisa explained that she was familiar with the children prior to their placement with her because she provided parent education to Michelle through the Early Head Start program. During the program, Elisa focused on health, nutrition, and education including helping the parents recognize where their child should be developmentally through the use of assessments and questionnaires. Elisa testified that Michelle was inconsistent and would only let her into the home about once per month. She indicated that her observed concerns including the uncleanliness of the home, lack of food, broken furniture, and trash in the home.

According to Elisa, when Leon and Lamiah were first placed with her, the children were unclean and Lamiah was wearing clothes that were too small. The children were sick, pale, lethargic, withdrawn, quiet, developmentally delayed, and nonverbal. Lamiah had dark purple circles under her eyes and Leon was "tiny, just scrawny looking, and nonverbal." Leon had an infection on one of his big toes and Lamiah had an ear infection which were both promptly treated. Both children were also severely anemic which required a prescription, and Leon had some decay in his front teeth. Elisa observed food insecurities with both children. She also noted that Roger and Michelle had been inconsistent in attending visitations and that when the parents did make their visits, the children would "revert back to how they were the first week" including throwing tantrums, Leon slamming himself onto the floor, and Lamiah hitting herself in the head with her fists. However, since being in foster care, Elisa noted that the children were getting healthier, getting back on track developmentally, eating with utensils, and were verbal.

### 4. COURT FINDINGS AND ORDERS

Following the close of the evidence, the court granted the motion to suspend visitation pending the decision on the State's motion to terminate parental rights. The court immediately adjudicated the children as children within the meaning of § 43-247(3)(a) but took the motion to terminate parental rights under advisement. Thereafter, the court terminated Roger's parental rights to Trey, Marian, Leon and Lamiah pursuant to § 43-292(1), (2) and (9) and terminated Michelle's parental rights to all six children pursuant to § 43-292(2) and (9). The court found that statutory grounds existed to terminate the parties' parental rights, that termination was in the minor children's best interests, and that the additional requirements under ICWA had been satisfied which required (1) a finding, by clear and convincing evidence, that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family or unite the parent with the Indian child and that these efforts have proved unsuccessful and (2) a finding, beyond a reasonable doubt, that the evidence, including qualified expert testimony, that the continued custody of the children by the parents was likely to result in serious emotional or physical damage to the children. Specifically, the court found:

> The evidence is overwhelming that these children have suffered severe, chronic abuse by their natural parents. The documented failures to provide for the basic needs of the children, including nutrition, shelter, and medical and dental care, along with the absence of any consistent effort to improve their parenting, make it clear to this court that attempting reunification with the natural parents would jeopardize and compromise the safety of the children and place each of them at an unreasonable risk to be re-abused. The fact that these children have survived the absence of reasonable, habitable living conditions is remarkable, and a testament to their resiliency and will to survive. Their living environment while under their parents' care was characterized by filth and uncleanliness, chronic parental substance abuse, domestic violence, and general apathy toward the needs of the children—including, at times, the absence of basic utilities and running water. The evidence demonstrates that very little thought, if any, was given by the parents to placing the needs of the children above their own wants and ambitions. Despite the documented repeated, active efforts by DHHS, the parents did nothing to make meaningful changes in

their capacity to appropriately parent the children. At one point before the twins were born, [Michelle] admitted she could not care for her existing children, let alone the ones she was due to deliver. Then she recanted, kept the twins instead of adopting them out as she had planned. Eventually, all of the children arrived in Scotts Bluff County in the care of a sick relative, living out of van. All of the children came into the state's care developmentally and academically delayed. Neither father has provided for the physical or emotional needs of the children, and up to this point, the children have long endured scarcity, desperation, and chaos as a normal way of life. Clear and convincing evidence further demonstrates the absence of a meaningful, beneficial relationship between parents and children. None of the parents have consistently prioritized visitation with the children, and none of the parents chose to personally appear in court for the adjudication hearing.

. . . .

. . . As applied in this instance, taking into consideration the totality of evidence from the adjudication hearings, including an assessment of the children's present circumstances and adjustments, as well as the children's long-term physical, social, and emotional needs, this court finds that sufficient evidence was presented to demonstrate clearly and convincingly that termination of parental rights is appropriate and in the best interests of the children. There is an abundance of evidence concerning the lack of a beneficial relationship between the parents and the children. The totality of the evidence, including the parents' individual failures to provide for their children demonstrate parental unfitness and collectively dictate in favor of termination of parental rights being in the children's best interests. These children should not be made to wait uncertain parental maturity when there is clear and convincing evidence that the children's overall future well-being stands to improve with the prospects of new relationships which the termination might open for them.

Roger timely filed a notice of appeal contesting the termination of his parental rights to his four children. Michelle also filed a notice of appeal and a "Brief of Appellee" requesting affirmative relief for each of her six children but did not designate her brief as a cross appeal.

## III. ASSIGNMENTS OF ERROR

Roger assigns as error, restated, that the court erred in finding by clear and convincing evidence that statutory grounds existed to support termination of his parental rights and that termination was in the minor children's best interests.

As we noted above, Michelle also filed a notice of appeal and a "Brief of Appellee" requesting affirmative relief for each of her six children but did not designate her brief as a cross appeal. Nebraska appellate courts "have repeatedly indicated that a cross-appeal must be properly designated, pursuant to [§ 2-10]9(D)(4), if affirmative relief is to be obtained." *In re Interest of Becka P.*, 27 Neb. App. 489, 512, 933 N.W.2d 873, 890 (2019). However, where an appellee submits a brief purporting to be a brief of appellant, which complies with the rules regarding an appellant's brief, and the appellee's brief does not take issue with any errors asserted by the appellant, the appellate court may, in its discretion, treat the brief of such appellee as a brief on cross-appeal. Neb. Ct. R. App. P. § 2-109.

- 9 -

Here, although Michelle is not designated as a cross-appellant in her brief relating to Roger's 4 children, or as an appellant relating to Elihu and Elias, the remainder of her brief comports with our court rules regarding requirements for the brief of appellant, see *State v. Pauly*, 311 Neb. 418, 972 N.W.2d 907 (2022), and she does not take issue with any of Roger's assigned errors, assigns the same errors, and much of the same evidence and testimony is applicable to both Roger and Michelle. Thus, we will consider Michelle's arguments on appeal as if correctly cross appealed. However, our decision to do so in this case should not be considered as indicative of similar treatment in the future of cross-appeals which fail to comport with our rules. See *State v. Pauly*, 311 Neb. 418, 972 N.W.2d 907 (2022) (depending on particulars of each case, failure to comply with mandates of Neb. Ct. R. App. P. § 2-109(D) (rev. 2022) may result in appellate court's waiving error, proceeding on plain error review only, or declining to conduct any review at all).

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases, including those under Nebraska ICWA, de novo on the record and reaches its conclusions independently of the juvenile court's findings in a termination of parental rights case; when the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Becka P., supra*; *In re Interest of Phoebe S.*, 11 Neb. App. 919, 664 N.W.2d 470 (2003).

## V. ANALYSIS

### 1. STATUTORY GROUNDS FOR TERMINATION

Roger and Michelle both argue that the court erred in finding that the State had established by clear and convincing evidence a statutory basis for termination. Roger contends that the court erred in finding that the State proved that he had abandoned his children under § 43-292(1), that he had substantially and continuously or repeatedly neglected and refused to give the minor children necessary parental care and protection under subsection (2), and that he had subjected the minor children to aggravated circumstances under subsection (9). Similarly, Michelle argues that the court erred in finding the evidence was sufficient to support termination of her parental rights under § 43-292(2) and (9).

To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Zachary D. & Alexander D.*, 289 Neb. 763, 857 N.W.2d 323 (2015).

ICWA adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. *In re Interest of Audrey T.*, 26 Neb. App. 822, 924 N.W.2d 72 (2019). First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. *Id.* See § 43-1505(4). Second, the State must prove by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the

- 10 -

parent or Indian custodian is likely to result in serious emotional or physical damage to the child. *In re Interest of Audrey T., supra*. See § 43-1505(6). Neither Roger nor Michelle have argued that the court erred in finding that the statutory ICWA requirements had been met.

Here, Roger argues that the primary reason the State sought termination was due to the "shortcomings of [Michelle] and her repeated history of intakes with [DHHS]." Brief for appellant at 14. Roger contends that he put his best efforts forward to raise his children and Michelle's two other children and that the State chose to pursue termination against him even though he has done little, if anything, wrong. Michelle only argues generally that the evidence was insufficient. We disagree with both asserted arguments.

The court found that the evidence was sufficient to support a finding that Roger and Michelle had "substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection" as defined under subsection (2). In addition, this lack of parental care rose to a level chronic abuse and neglect that posed serious health, safety and welfare concerns as evidenced by the court's findings under subsection (9). The record shows that at the time the intake was received, Michelle had been incarcerated and all six of the children were living in a van with their sick aunt and her three children. Although Michelle contacted Armstrong stating neither she nor her sister were able to care for the children, Michelle did not indicate why Roger did not take the children into his care. Evidence adduced during the trial established that all the children were academically and developmentally delayed and had not been to school for possibly the last two academic years.

Additionally, neither parent was meeting the children's medical and behavioral needs. The record established that the children have suffered from severe infections, tooth decay, anemia, iron deficiencies, and mental health concerns including self-harm, food complexes, and others. Neither Roger nor Michelle attended routine wellness checkups, dental appointments, or sought support for the children's mental health or academic delays. Additionally, on one occasion in February 2020, when the parents did seek medical attention for Lamiah and Leon, they abruptly left the doctor's office after the doctor left the room to obtain a test to ensure the children were breathing properly and were safe to go home.

Relevant to their medical health, the children lacked good hygiene, lacked appropriate clothing, suffered nutritional deficits, and at least two of the children did not have shoes. Elihu indicated to the caseworker that there were multiple occasions where there was barely enough food in the home. He stated that when there was not enough food, he would eat a very small portion, or he did not eat at all. Additionally, the foster parents reported concerns of the children having food complexes to some degree. Prior to their arrival in Nebraska, the family had been residing in a shelter in South Dakota. Elihu reported that the shelter was the only time he had a bed to sleep on. He indicated that they also lived in an apartment at one time, but that there were so many bugs in the home that he could hear them under the carpet; and when he would walk through the home, he could hear the bugs crunch under his feet.

The evidence further showed significant concerns as a result of substance abuse, physical abuse of the children, and domestic violence between Roger and Michelle. While in the presence of the children and during the time she was pregnant with the twins, Michelle abused alcohol and methamphetamine. Roger witnessed Michelle's drug use and, during a prior case, indicated that it

was a common occurrence within their household. However, despite his concerns, Roger did not remove the children from Michelle's care. Elihu also expressed concerns about Michelle's alcohol abuse, stating that Michelle became angry when she drank which resulted in Michelle and Roger fighting, all of which occurred in the children's presence. Elihu also described times when Michelle had become too intoxicated to drive and he had to drive on highways even though he was not of legal driving age. Elihu indicated to the caseworker that he was scared of Michelle dying from alcohol. Elihu further disclosed that Roger, who is the father of his four youngest siblings, hit them and made the children fight each other. Elihu stated that he saw himself as the "protector" of his siblings. Elihu spent much of his childhood acting as the parent while placing his own personal needs aside. Elihu now suffers from mental health conditions which include thoughts of self-harm.

It is evident by the record that the children have not been provided safe or stable housing, nor were their needs being properly met by either parent. The evidence presented at the termination hearing clearly and convincingly established that the minor children were the victims of repeated abuse and neglect by their parents. Accordingly, the court properly found that termination was appropriate under § 43-292(2). Further, § 43-292(9) separately provides for termination when "[t]he parent of the juvenile has subjected the juvenile or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse." The term "aggravated circumstances" embodies the concept that the nature of the abuse or neglect must have been so severe or repetitive that to attempt reunification would jeopardize and compromise the safety of the child and would place the child in a position of unreasonable risk to be reabused. *In re Interest of Angelina G.*, 20 Neb. App. 646, 830 N.W.2d 512 (2013). We find that the nature of the abuse and neglect described in this record rose to the level of aggravated circumstances as that term is defined and the court did not err in so finding.

Having determined that at least one statutory basis existed to support termination of Roger and Michelle's parental rights, we need not further address the sufficiency of the evidence to support termination under any other statutory ground. See *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

### 2. ICWA REQUIREMENTS

Although neither of the additional ICWA requirements were assigned as an error or argued on appeal, we review for plain error. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004).

Section 43-1505, which governs the two additional requirements under Nebraska ICWA, provides in pertinent part:

> (4) Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family or unite the parent or Indian custodian with the Indian child and that these efforts have proved unsuccessful. Any written evidence showing that active efforts

have been made shall be admissible in a proceeding under the Nebraska Indian Child Welfare Act. Prior to the court ordering placement of the child in foster care or the termination of parental rights, the court shall make a determination that active efforts have been provided or that the party seeking placement or termination has demonstrated that attempts were made to provide active efforts to the extent possible under the circumstances. . . . .

(6) The court shall not order termination of parental rights under this section in the absence of a determination by the court, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

### (a) Active Efforts

ICWA and Nebraska law requires the State of Nebraska to prove by clear and convincing evidence that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family prior to the termination of parental rights. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). The "active efforts" standard under the ICWA termination of parental rights provision requires more than the "reasonable efforts" standard that applies in cases involving non-Indian children. *Id.* To constitute "active efforts" under ICWA, termination of parental rights provision requires at least some of the active efforts should be "culturally relevant." *Id.* The "active efforts" standard under ICWA termination of parental rights provision requires a case-by-case analysis. *Id.*

Here, the record shows that the parents were provided with multiple opportunities to engage in services. In addition to supervised visitation, the parents were provided with family support through Native Futures, parenting class information, mental health and substance abuse referrals, gas and clothing vouchers, additional family support specifically for Roger, family finding services to locate native familial placements, strengths and needs assessments, and other services. We find no plain error in the court's determination that active efforts were satisfied.

### (b) Serious Emotional or Physical Damage

Section 43-1505(6) requires that the qualified expert's opinion must support the ultimate finding of the court, that is, that continued custody by the parent will likely result in serious emotional or physical damage to the child. Pursuant to ICWA, qualified expert testimony is required in a parental rights termination case on the issue of whether serious harm to the Indian child is likely to occur if the child is not removed from the home. *In re Interest of Audrey T.*, 26 Neb. App. 822, 924 N.W.2d 72 (2019).

As part of its case, the State called Chasity Duarte who testified that she was the ICWA specialist for her area. Part of her duties included ensuring that ICWA compliant services were referred for the family. Duarte stated that, in her opinion, it was in the children's best interests for the parental rights to be terminated. Duarte testified regarding the severity of concerns and safety threats including that Roger and Michelle were not actively caring for the children, the children

had suffered severe neglect over years, and the children exhibited high levels of need at the time that they reentered the State's care. Additionally, the children's medical providers testified regarding the children's physical and mental health including significant tooth decay which led to multiple extractions and severe infections, infections that spread to the bone causing great pain, untreated abscesses which could have eventually caused death, iron deficiencies and anemia, other concerns related to nutritional deficits, mental health concerns rising to the level of self-harming behaviors, and developmental or educational delays which led to all but one of the children being unable to communicate effectively. In performing our plain error review, we find no plain error in the court's finding that the evidence supported, beyond a reasonable doubt, that serious harm to the Indian children was likely to occur if the children were not removed from the parents' care.

### 3. BEST INTERESTS

Roger and Michelle next assign as error that the court erred in finding that termination of their parental rights was in the minor children's best interests.

Under § 43-292, in addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph* S. *et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

Here, the record reveals that the family had a significant history of CFS involvement relating to the care of these six children as a result of continuous substance abuse, physical abuse, neglect of the children's needs, and domestic violence occurring in front of the children. Moreover, the court found, and we agree, that Roger and Michelle subjected the children to chronic abuse, or aggravated circumstances, which substantially created a high risk to the children's health, safety and welfare.

Both Roger and Michelle failed to engage in services and did not stay in contact with Duarte. Despite being offered visitation, Roger failed to attend the majority of those visits, and, as to the ones he did attend, he failed to attempt to develop a relationship with the children. Michelle likewise was offered visitation services but minimally participated and missed numerous visits with her children. As a result of Roger and Michelle's inconsistencies in participating in visitation,

- 14 -

the foster parents testified that the children developed behavioral issues including not listening, self-harming thoughts, memory issues, and inability to focus. Neither parent actively became involved in ensuring the children's educational needs were being met and they failed to attend three meetings set up for the children in order to address the noted delays. In addition, over the course of time, both parents have been incarcerated and were unable to meet the children's needs while Elihu attempted to parent his younger siblings and half-siblings during Roger and Michelle's absence.

Under our de novo review, it is clear that neither parent has positioned themselves to properly provide care and supervision of their children. The children have suffered because of their parents' unwillingness to perform their most basic parental obligations. The parents' actions have and will likely continue to significantly harm the minor children. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Angelina G. et al.*, 20 Neb. App. 646, 830 N.W.2d 512 (2013). Therefore, we agree with the county court that termination was in the best interests of the minor children. This assignment of error fails.

## VI. CONCLUSION

For the reasons stated herein, we affirm the court's order terminating both Roger and Michelle's parental rights to their respective children.

AFFIRMED.